1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF WYOMING

3  _____

   UNITED STATES OF AMERICA,
4
            Plaintiff,                   DOCKET NO. 14-PO-110-J
5
            vs.                          CHEYENNE, WYOMING
6                                        June 20, 2014
   COMFREY JACOBS,                       9:34 a.m.
7
            Defendant.
8  _____

9      TRANSCRIPT OF CHANGE OF PLEA AND SENTENCING PROCEEDINGS

10              BEFORE THE HONORABLE MARK L. CARMAN
                 UNITED STATES MAGISTRATE JUDGE
11
   APPEARANCES:
12 For the Plaintiff:      FRANCIS LELAND PICO (By Telephone)
                           Assistant United States Attorney
13                         MARK R. BITTNER
                           Intern
14                         UNITED STATES ATTORNEY'S OFFICE
                           P.O. Box 703
15                         Yellowstone, NP  82190

16

17 For the Defendant:      SUMMER L. NELSON
                           GENTRY & NELSON MERRILL LAW GROUP, PC
18                         317 East Spruce Street
                           P.O. Box 8331
19                         Missoula, MT  59802

20

21
   Court Reporter:         JANET DAVIS, RDR, FCRR
22                         United States Court Reporter
                           2120 Capitol Avenue, Room 2228
23                         Cheyenne, Wyoming  82001
                           (307) 635-3884/jbd.davis@gmail.com
24
   Proceedings recorded by digital stenography, transcript
25 produced with computer.

1          (Proceedings commenced 9:34 a.m., June 20, 2014.)

2          THE COURT:  We will take up the case of the United

3     States versus Comfrey Jacobs.

4          Mr. Jacobs, you're back with us today.

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  And you are represented by your attorney,

7     Ms. Nelson, from Missoula.

8          MS. NELSON:  Yes, Your Honor.

9          THE COURT:  Good day.  Welcome to our court.

10         MS. NELSON:  Thank you.

11         THE COURT:  The Government is represented by Mr. Pico

12    who is appearing by telephone due to a family commitment.

13         MR. PICO:  Good morning, Your Honor.  Thank you.

14         THE COURT:  Hello there.

15         MR. PICO:  Thank you for accommodating me.  Judge, if

16    you don't mind, Mr. Bittner will probably be doing most of the

17    talking on behalf of the United States.  And as in the past,

18    Judge, when I've appeared by phone, I'm going to be putting on

19    my mute button so that no extraneous noise here will interrupt

20    the proceedings.

21         THE COURT:  You mean there's extraneous noise at a

22    Scout jamboree?

23         MR. PICO:  I know it seems hard to believe, but there

24    is.

25         THE COURT:  Okay.  And Mr. Bittner is here in the

1    courtroom representing the Government.  Good morning.

2           MR. BITTNER:  Good morning, Your Honor.

3           THE COURT:  Okay.  The -- we -- on May -- March 11th,

4    you, Mr. Jacobs appeared in front of me.  You were informed of

5    the charges, your rights.  And on April 2nd you were arraigned

6    and you entered a not guilty plea at that point in time.  I'm

7    informed today and have been provided a copy of a plea

8    agreement.  It's called Plea Agreement and Guilty Plea which

9    is -- has been signed by yourself, your counsel and by the

10   representatives of the U.S. Attorney's Office.  Let me look at

11   something here.

12          Okay.  Ms. Nelson, is that, in fact, what we're going

13   to do today, enter a guilty plea and do a sentencing?

14          MS. NELSON:  Yes, Your Honor, that's still the

15   intention.

16          THE COURT:  Okay.  Is the Government ready?

17          MR. BITTNER:  Yes, Your Honor.

18          THE COURT:  Okay.  Can I have Mr. Jacobs and your

19   attorney please approach the podium.

20          Okay.  First of all, as in any case in which there's a

21   plea agreement, I want to make sure you understand the process.

22   I am not a party to the plea agreement.  You will notice that

23   you will not find my signature on this form and I am -- I'm not

24   bound by this agreement.  This is an agreement between you and

25   the United States Government as far as a recommendation, if you

1    will, to the Court.  But I retain the right to do what I think

2    is appropriate because I'm the one who is ultimately tasked

3    with imposing the sentence.  Do you understand that?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  So you understand that I can do what I

6    think is appropriate regardless of the plea agreement, but I do

7    give weight to the agreement of the parties?  Do you understand

8    that?

9            THE DEFENDANT:  Yes.

10            THE COURT:  And is it your intention, then, to enter a

11    guilty plea today pursuant to this plea agreement that you've

12    entered with the Government?

13            THE DEFENDANT:  Yes.

14            THE COURT:  Okay.  The first step of doing that is to

15    have you placed under oath.  I'm required to do this as part of

16    the process of entering a plea.  I am required to advise you

17    that if you do provide false information to the Court while

18    under oath, it could lead to an additional prosecution for

19    perjury or false statement.  Do you understand that?

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  Can you please administer the oath to Mr.

22    Jacobs.

23        (Defendant sworn.)

24            THE COURT:  The first few questions I want to talk to

25    you about sometimes catch people off guard.  I just want to

1    make sure that there's nothing interfering with your ability to

2    understand these proceedings and make an important decision

3    such as entry of a plea.

4             Are you currently under the influence of alcohol or

5    drugs?

6             THE DEFENDANT:  No, Your Honor.

7             THE COURT:  Do you have any mental or physical

8    condition that would interfere with your ability to understand

9    these proceedings?

10            THE DEFENDANT:  No, Your Honor.

11            THE COURT:  Do you -- do you take any prescription

12   medications?

13            THE DEFENDANT:  No.

14            THE COURT:  Okay.  Very good.  Now, other than the --

15   the recommended -- the recommendation found in the plea

16   agreement that has been made part of the record in this case,

17   has anyone else applied any pressure to you or encouraged you

18   in any other way to enter a guilty plea to this charge today?

19            THE DEFENDANT:  No, Your Honor.

20            THE COURT:  I just want to make sure that you are

21   doing this because it's of your own free will.  Is that in fact

22   the case?

23            THE DEFENDANT:  Yes, Your Honor.

24            THE COURT:  And are you a United States citizen?

25            THE DEFENDANT:  Yes.

1          THE COURT:  The reason I ask that is there's some

2    additional advertisements I have to give you if you are not.

3    You do understand by entering a guilty plea you will be giving

4    up your right to a trial that I explained to you sometime in

5    the past here at one of these hearings.

6          THE DEFENDANT:  Uh-huh.

7          THE COURT:  You understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  Mr. Bittner, there is only one

10   violation notice in this case, correct, only one charge?

11         MR. BITTNER:  Only one charge as per the plea

12   agreement, correct, Your Honor.

13         THE COURT:  Wait a minute.  There's -- actually, I

14   have multiple charges.  Let me make sure I'm clear on this.

15   The anticipation is that he would enter a guilty plea to

16   violation notice 0655322, interference with agency function?

17         MR. BITTNER:  That is correct, Your Honor.

18         THE COURT:  And then the remaining violations would be

19   dismissed by the Government.

20         MR. BITTNER:  As per the plea agreement, Yes, Your

21   Honor.

22         MR. PICO:  And that -- excuse me -- that would be a

23   dismissal, my recollection is, without prejudice.

24         MS. NELSON:  I believe, Your Honor, that the agreement

25   actually says with prejudice.

1          MR. PICO:  Okay.  That's fine.  I couldn't remember.

2     I thought it was without.  If that's what the agreement says,

3     that's what the agreement is.

4          MS. NELSON:  Yes, page 4, paragraph 10.

5          THE COURT:  It does say --

6          MR. BITTNER:  It does say with prejudice.

7          THE COURT:  It does say with prejudice.

8          MR. PICO:  Thank you.

9          THE COURT:  Okay.  Okay.  And, Mr. Jacobs, so you

10    understand, when we talk about it being dismissed with

11    prejudice or without prejudice, that simply means that if it is

12    dismissed with prejudice, that means it cannot be refiled; it

13    is gone forever.

14          THE DEFENDANT:  Okay.

15          THE COURT:  And that's why it is a significant issue.

16    Make sure we're clear on that.

17          Okay.  Mr. Jacobs, as to the charge of interfering

18    with an agency function in violation of 36 Code of Federal

19    Investigations 2.32(a)(1) on March 6th of this year within the

20    boundaries of Yellowstone National Park, how do you plead?

21          THE DEFENDANT:  Guilty.

22          THE COURT:  Okay.  The next step is that I need to

23    talk to you a little bit about what happened.  This is called

24    establishing a factual basis.  What I'm trying to do is assure

25    that there is --

1          Yes, you may.  One second.  Thank you.

2          We have to make sure we get a good recording of this

3    event.  That's the official record.

4          I was talking about establishing a factual basis.  You

5    can't plead to something you didn't do, and so what I'm going

6    to do is inquire a little bit to see what happened to make sure

7    it satisfies the element of the offense.

8          So you understand, I'm going to read to you what the

9    Code of Federal Regulations specifically says.  It says, "The

10   following are prohibited:  Threatening, resisting, intimidating

11   or intentionally interfering with a governmental employee or

12   agent engaged in an official duty or on account of the

13   performance of an official duty."

14         Tell me what you did that you believe was interference

15   with an agency function on March 6th of this year.

16         THE DEFENDANT:  I intentionally tried to halt the

17   transportation of America's last wild bison to slaughter by

18   Yellowstone National Park by placing myself in a lockbox device

19   at the Stevens Creek Bison Trap Facility's front gate.

20         THE COURT:  I'm sorry.  I didn't mean to interrupt.

21         THE DEFENDANT:  I'm sorry.  I did this in the way of

22   intentionally putting myself in the middle of the road so

23   trailers could not enter the facility.

24         THE COURT:  I think you said lock gate.

25         THE DEFENDANT:  Lockbox.

1              THE COURT:  Lockbox, what do you mean?

2              THE DEFENDANT:  I constructed a device that was meant

3    to make myself passively immovable from that gate.

4              THE COURT:  And describe -- describe how you did that.

5              THE DEFENDANT:  I constructed a -- basically a

6    50-gallon barrel with an arm tube inside that I had an

7    improvised handcuff around my wrist and was -- my left arm was

8    inside this barrel that was constructed to make it more

9    difficult for my removal.

10             THE COURT:  Okay.  And then did you actually attach

11   yourself to any of the property other than the barrel?

12             THE DEFENDANT:  I was attached to the gate as well,

13   not physically, but my device was.

14             THE COURT:  And this is a gate that needed to be

15   opened and closed, if you will, for purposes of the bison

16   operations by the Park Service employees?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  And you did this intentionally to

19   interfere with that particular operation?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Any further -- anything from the

22   Government regarding the factual basis?

23             MR. BITTNER:  Thank you, Your Honor.  May it please

24   the Court, Ms. Nelson, Mr. Jacobs.  The Government just want to

25   also put forward that Mr. Jacobs refused to self-release.

1    Whether he was able to or not is not relevant.  However, it

2    took the rangers many hours to finally dismantle the barrel in

3    order to finally have him get released.  Mr. Jacobs knew what

4    he was doing and he was intentionally interfering.  Thank you.

5            THE COURT:  Okay.  It is the finding of the Court in

6    the case of the United States versus Comfrey Jacobs that Mr.

7    Jacobs is fully competent and he is aware of the nature of the

8    charges and the potential consequences of the plea.  And he has

9    entered this guilty plea knowingly and voluntarily, and

10   further, the plea is supported by an independent basis in fact

11   as to each of the essential elements of the -- of the charge.

12   So the plea is hereby accepted and Mr. Jacobs is now adjudged

13   guilty of this offense.

14           And so now we will take up the issue of sentencing.

15   Before I do that, I will grant the Government's motion at this

16   point in time, and I will dismiss violation No. 0655321, entry

17   of a closed area, in violation of 36 C.F.R. 1.5(f), and dismiss

18   violation No. 0655323, disorderly conduct, in violation of 36

19   Code of Federal Regulations 2.34(a)(4), all occurring on March

20   6th of this year within the boundaries of Yellowstone National

21   Park.  And I will grant that Government's motion, dismissal

22   then with prejudice pursuant to the agreement, the plea

23   agreement.

24           Okay.  I should confirm -- I should have done this

25   before.  You did in fact review and sign the plea agreement; is

1   that true, Mr. Jacobs?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  And the signature on it is, in fact, your

4   signature?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  And, Ms. Nelson, is this, in fact, your

7   signature and did you review this plea agreement with your

8   client?

9            MS. NELSON:  Yes, Your Honor.

10            THE COURT:  Okay.  Okay.  And likewise, Ms. Nelson,

11   are you satisfied that a factual basis has been established for

12   your client's guilty plea?

13            MS. NELSON:  I am, Your Honor.

14            THE COURT:  And are you satisfied that the other

15   charges have been properly dismissed?

16            MS. NELSON:  Yes, Your Honor.

17            THE COURT:  Okay.  Very good.  Okay.  We now come to

18   the issue of determining a sentence.  And I'm going to have Mr.

19   Bittner summarize briefly on the record what the proposed

20   sentence is pursuant to the plea agreement and then present any

21   information that he wishes that would assist the Court in

22   determining what sentence ultimately to impose.

23            MR. BITTNER:  Thank you, Your Honor.  May it please

24   the Court.  The plea agreement has Mr. -- has Mr. Jacobs paying

25   restitution in the amount of $355.38 to the National Park

1   Service for response costs and impacts to the park facility

2   resources.

3          Mr. Jacobs will be placed on unsupervised probation

4   for a period of one year with a condition that Mr. Jacobs does

5   not enter Yellowstone National Park for this one year.

6          Furthermore, Mr. Jacobs will not commit any violations

7   of any federal, state, tribal or local laws during this time of

8   unsupervised probation.

9          The defendant will pay a special assessment fee of $10

10  and the court processing fee of $25, for a total of $35.

11         The defendant will be serving seven days in jail

12  without consideration for time served and with that ideally

13  would be today he would surrender himself to the Marshals.

14         Furthermore, Your Honor, beyond the plea agreement, it

15  should be noted that during the initial negotiations the

16  Government offered to dismiss the charges with a plea including

17  a five-year ban from the Park and five years of unsupervised

18  probation.  However, Ms. Nelson and the defense countered and

19  said instead of five years, one year and seven days in jail, to

20  which the Government accepted.

21         Furthermore, Mr. Jacobs does not seem to show remorse

22  for his actions despite hindering Park Service resources and

23  business -- and the business conduct of the bison.

24         Furthermore, Mr. Jacobs has actually partnered with

25  somebody else regarding a -- regarding the contributions for

1    his legal defense in a fund and ultimately raised 4,990.  As a

2    result, depriving Mr. Jacobs of his freedom for one week seems

3    to be more than acceptable as a result of this and that the

4    plea agreement overall would be fair.

5           And furthermore, accordingly, as stated before, the

6    National Park rangers took many hours to release Mr. Jacobs

7    from the barrel that he attached himself to, 55-gallon barrel,

8    took many hours and Mr. Jacobs refused to self-release.  And it

9    apparently seemingly appeared to the rangers that he would have

10   been able to self-release far before the dismantling of the

11   barrel.

12          Therefore, the Government believes that this plea

13   agreement is acceptable and worthwhile of Mr. Jacobs'

14   incarceration.  Thank you.

15          THE COURT:  Okay.  And I know we have Mr. Pico on the

16   line.  Does Mr. Pico have anything he wishes to add at this

17   point in time?

18          MR. PICO:  No.  I think Mr. Bittner has said

19   everything appropriately, Your Honor.  And I will tell you,

20   Judge, that the initial discussion that I had with Ms. Nelson

21   was with regard to a five-year ban from the Park, she --

22   initially we had discussions about 10 to 20 days and we

23   discussed and agreed upon the 7-day jail sentence.  I believe

24   that a 7-day jail sentence is reasonable under all the facts

25   and circumstances as outlined by Mr. Bittner, and the -- one of

1   the things we're interested in telling folks is that it's not

2   appropriate to do this and that there is jail consequences for

3   this, so that's the (inaudible).  Thank you.

4           THE COURT:  Now I will turn to Ms. Nelson.  I want to

5   give you an opportunity to speak on behalf of your client at

6   this point in time.

7           MS. NELSON:  Okay.  Thank you, Your Honor.  Do I need

8   to adjust the --

9           THE COURT:  Yes, please.

10          MS. NELSON:  Okay.  Your Honor, I would just point out

11  that Mr. Jacobs has no prior convictions on his record and even

12  this act of nonviolent civil disobedience that was motivated by

13  his compassion and political convictions is the first of its

14  kind; that he's participating with Buffalo Field Campaign and

15  other social and environmental justice efforts in many other

16  ways as well, as he may share with the Court.  You know, he's

17  written letters, he has petitioned the government in other

18  ways, and he's currently employed as a coordinator for the

19  Buffalo Field Campaign helping carry out fully legal activities

20  and that this action was simply motivated by his conviction

21  that what the government was doing was wrong and that he

22  believed there was a better way.  And he was willing to put

23  himself -- you know, to take some sacrifice in order to do what

24  he thought was -- was the right -- to encourage the Government

25  to take the right action.

1          And Mr. Jacobs has appeared for every hearing.  I

2     believe this is the third time, perhaps, that he's appeared

3     here and traveled to the court and has shown that he's willing

4     to take responsibility for his actions and by his signature on

5     the agreement can see that he's even willing to sacrifice his

6     freedom for seven days.

7          But I do think that the remainder of the agreement,

8     the sentence would be sufficient, if Your Honor decides not to

9     impose a jail sentence.  There were a couple similar cases in

10    2008, Case Nos. 208-M-2072-001 and M-2073-001.  They were

11    Simonitis (sic) and Wasser, and they were two young woman who

12    locked themselves to the Visitor Center here in Mammoth and

13    also refused to release for some time and had the Park on high

14    alert.  They were charged with disorderly conduct and resisting

15    and interfering with government employees.

16         And the plea agreement and Judgment -- there was

17    dismissal of one charge and they entered guilty pleas to one

18    and they served a sentence of one year unsupervised probation

19    with a ban from the Park and paid a $10 assessment and $120 --

20    $125 fine.

21         And so I don't think that anything much above and

22    beyond that is necessary here.  And I would say that Mr. Jacobs

23    would be willing to, say, pay a fine from that legal defense

24    fund and/or have a fine that's converted to community service

25    and would be willing to report and serve the community in that

1    way as an alternative to jail or extended probation.  And some

2    of his -- he's planning to continue to work for Buffalo Field

3    Campaign through the summer and then would like to go spend

4    some time with his mother in Colorado and then would be seeking

5    employment again the following year.

6              So that's all for now, Your Honor.  Thanks.

7              THE COURT:  Okay.  Mr. Jacobs, you have an opportunity

8    to tell the Court anything you would like the Court to take

9    into account at the time of sentencing.  I will, quite frankly,

10   perhaps have some questions for you, but I wanted to give you

11   an opportunity to make sure -- I want to make sure I give you

12   the opportunity to tell me anything you'd like me to take into

13   account in imposing the sentence in this matter.

14             THE DEFENDANT:  I have nothing I would like to add

15   except that I'm fully ready to accept all responsibility and

16   consequences of my actions.  Uhm, I believe that even though

17   they may be deemed illegal, I was doing the right thing in

18   standing up for what I believe in as far as the teachings of

19   some of my great mentors like Martin Luther King and Gandhi.

20   And I'm completely ready to face whatever happens.

21             THE COURT:  Okay.  I find it interesting that you

22   would invoke people like Gandhi and Martin Luther King and the

23   great works they did on behalf of people and compare it with

24   the work of the bison, the BFC.  What I'm more interested in is

25   what kind of citizen are you going to be going forward.  There

1   are people who believe that their own personal beliefs allow

2   them to violate the law and there are mechanisms in this

3   country, not in all countries but in this country, which grant

4   people the right to express their opinions.  Our First

5   Amendment is well recognized is the freedom of speech and you

6   have, obviously, exercised your freedom of speech on other

7   occasions without causing violations of law.

8              In this one you took active steps beyond the freedom

9   of speech designed to specifically interfere with a lawful

10  government operation.  How did you get the idea for the device?

11             THE DEFENDANT:  I have seen it used in multiple other

12  activist campaigns.

13             THE COURT:  And is there plans on the Internet for how

14  to do it or --

15             THE DEFENDANT:  No, it was something that I

16  constructed on a basic concept.

17             THE COURT:  Okay.  And did that involve any metal

18  working, welding or anything of that nature, or how did that

19  work?

20             THE DEFENDANT:  No, it involved finding a bunch of

21  scrap pieces at a junkyard and constructing it and buying

22  concrete out of my personal money.

23             THE COURT:  Okay.  And how you were -- you've been

24  with the BFC for how long now, working with them?

25             THE DEFENDANT:  Almost two years.

1          THE COURT:  And it is my understanding that you have

2    solicited and raised monies for your defense?

3          THE DEFENDANT:  That's correct, Your Honor.

4          THE COURT:  Okay.  And is it true that you've raised

5    about $5,000?

6          THE DEFENDANT:  That is correct, Your Honor.  I had a

7    lot of public support for my action and people wanted to

8    contribute whatever way they could.

9          THE COURT:  But it is my understanding that Ms. Nelson

10   is not charging for this, she's providing these services pro

11   bono.  Is that, in fact, the case?

12         THE DEFENDANT:  There's going to be expenses for

13   travel and other things provided out of my legal fund, and we

14   will perhaps work out an agreement for some monetary

15   contribution as well.

16         THE COURT:  Because I do have a little bit of concern.

17   If people are giving you money to provide for your legal

18   defense, then that money should be used for your legal defense.

19   It shouldn't be used to profit.  I mean, I'm concerned that you

20   may financially profit from your actions here.

21         THE DEFENDANT:  I am not interested in financial

22   benefits from this.  I was doing this to raise awareness on the

23   issue, and I believe that money should be going towards

24   supporting my current legal situation and the buffalo.

25         THE COURT:  Okay.  Do you work with BFC in any other

1   locations than the Yellowstone ecosystem?

2           THE DEFENDANT:  No.

3           THE COURT:  Okay.  I don't know if they -- I don't

4   know if the BFC works anywhere else.  Do you know?

5           THE DEFENDANT:  We have large bases of national and

6   international support and occasionally do road shows and

7   speaking tours.

8           THE COURT:  Are you working on behalf of any other

9   groups other than other than the BFC?

10          THE DEFENDANT:  I wouldn't say working, but I do

11  volunteer with a lot of other groups.

12          THE COURT:  Okay.  And do you have any employment?

13          THE DEFENDANT:  I'm currently employed by Buffalo

14  Field Campaign and was working in a gift shop in West

15  Yellowstone.

16          THE COURT:  Okay.  One of the things that's often

17  used, one of the powers of sentencing often used by this Court

18  is a ban from the Park, and the plea agreement involves a ban

19  of one year.  It is my understanding really that -- the plea

20  negotiations are not my concern, but nevertheless, I have been

21  informed that a jail sentence was actually something that was

22  proposed by the defense in this case, not by the Government.

23          Can you explain to me why you think a jail sentence is

24  more appropriate than a ban from Yellowstone National Park?

25          THE DEFENDANT:  Uhm, I feel that the ban from

1   Yellowstone, though probably well deserved for my action and I

2   would accept, but I feel that it is trying to limit the work

3   that I do with Buffalo Field Campaign in several ways.  And

4   honestly, I feel if I was going to be incarcerated in the

5   judicial system, I would rather be physically incarcerated.

6           THE COURT:  Have you ever been arrested before?

7           THE DEFENDANT:  Uhm, I have been in custody before.

8           THE COURT:  What was that about?

9           THE DEFENDANT:  Uhm, similar political actions, not

10   quite as extreme, but unpermitted marches in the 2008

11   Democratic National Convention.

12           THE COURT:  So that was something where a lot of

13   people were arrested?

14           THE DEFENDANT:  There were mass arrests in that.

15           THE COURT:  And you were never charged?

16           THE DEFENDANT:  I was never charged.

17           THE COURT:  And where are you living now?

18           THE DEFENDANT:  I'm currently living at 14365 Hebegan

19   Lake Road, West Yellowstone, at Buffalo Field Campaign's

20   headquarters.

21           THE COURT:  When you set up this -- this blockade, if

22   you will, were there -- did you have other people there with

23   you at that time.

24           THE DEFENDANT:  No.

25           THE COURT:  Were there -- did other people show up and

 1   watch?

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  How did they know?  Did you tell them

 4   ahead of time you were going to do it so they knew to be there?

 5              THE DEFENDANT:  They didn't know what I was going to

 6   do but they did have a general idea that something was going to

 7   happen.

 8              THE COURT:  And you have a high school diploma?

 9              THE DEFENDANT:  I do have a GED.

10              THE COURT:  Okay.  And do you have any post-high

11   school education?

12              THE DEFENDANT:  I have attended vocational classes

13   with college credits for wildland firefighting.

14              THE COURT:  Have you ever worked with -- in

15   firefighting?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Have you ever obtained any formal

18   education regarding wildlife management, ecosystems?

19              THE DEFENDANT:  I have audited the classes but I have

20   never actually attended any long term.

21              THE COURT:  Where did you audit classes?

22              THE DEFENDANT:  I audited classes at Colorado Mesa

23   University and Colorado Mountain College.

24              THE COURT:  What are your plans for the next five

25   years?

1          THE DEFENDANT:  Uhm, I would like to continue working

2     with Buffalo Field Campaign and the buffalo for at least the

3     next year, and then I was planning on attaining a veterinary

4     technician degree in the next several years.

5          THE COURT:  And do you have family support to help you

6     achieve that goal?

7          THE DEFENDANT:  Not financial, but I do have

8     Americorps stipends from working with youth corps in the past.

9          THE COURT:  And how old are you?

10          THE DEFENDANT:  I'm 21.

11          THE COURT:  Anything further from the Government at

12     this point in time?

13          MR. BITTNER:  Yes, Your Honor.  Thank you.  While it

14     is not part of the plea agreement, the Government would accept

15     any excess profits from the donation for Mr. Jacobs' legal

16     defense fund to be donated as a community service payment to

17     the Yellowstone National Park Wildlife Protection, if that

18     would be acceptable to the defense.

19          The Government doesn't feel -- the Government does not

20     want Mr. Jacobs to profit from this ordeal with the donations

21     made to him.

22          MS. NELSON:  Maybe you can explain.

23          If it is all right, Your Honor, can I have my client

24     explain how this fund is set up and what the plans for that

25     money are, just so we have an idea.

1          THE COURT:  Yes.

2          THE DEFENDANT:  That legal fund was established by a

3    supporter who I've never actually met in my entire life.  We've

4    only had Internet communications.  They set it up through a

5    website called Go Fund Me, I believe.  That money was later

6    transferred to a Pay Pal account to my bank account, and some

7    of it still remains in an Internet account and some of it is in

8    my physical account to pay for expenses such as restitution, my

9    attorney's expenses and my personal travel expenses for legal

10   issues.

11          I don't want to profit from this.  I didn't do this to

12   profit or for self-gain.  I did this for the Buffalo and what

13   is leftover after the entire costs of my legal fees,

14   restitution and my legal counsel's expenses, I was going to

15   give that back to nonprofits and other community organizations

16   that are doing similar work as myself.

17          THE COURT:  I do have a concern about profiting from

18   this offense.  I have a little bit of concern that other people

19   are paying your restitution as well, but --

20          MR. BITTNER:  If I may, Your Honor, the fact of the

21   matter is the wild -- Yellowstone National Park Wildlife

22   Protection would be a community service payment and that could

23   be considered a nonprofit, so, therefore, Mr. Jacobs' goals and

24   the Government's goals are very similar.  This would just be a

25   specified place to donate to.  Thank you.

1          THE COURT:  But I'm also questioning this -- what I'm

2    thinking about here is that I don't know how much to order that

3    payment because I think some of that money should go to your

4    counsel for her representation.  And I don't know whether she

5    plans to -- I mean, it is a little different situation to take

6    on a client pro bono.  It is a different situation to take a

7    client pro bono who has a legal defense fund.  And so --

8          MS. NELSON:  Your Honor, I think, you know, when his

9    fund started nobody had any idea how much he would get and he

10   didn't know what he would be facing in terms of restitution or

11   fines.  So until recently there were a lot of unknowns around

12   this.

13         So our agreement was that he would cover costs and

14   that I was not charging for representation.

15         THE COURT:  And that's the agreement you're going to

16   stay with, you're not going to change your agreement with your

17   client and request any payment out of the legal defense fund

18   for your services.

19         MS. NELSON:  I'm not going to request any fee.  If he

20   chooses to use it for that because there's some left over then

21   we can have that discussion separately.  But I -- my

22   understanding has always been that it would -- that money was

23   set aside for whatever he needed because people were interested

24   in supporting.

25         THE COURT:  But it is my understanding it was entitled

1   a legal defense fund.  Is that in fact correct, Mr. Bittner?

2        MR. BITTNER:  It is entitled Direct Action:  Fund

3   Comfrey Root.  Furthermore, it initially states that the goal

4   was $5,000 and that as of April 26th, 2014 the money -- the

5   $4,990 were raised and that they were no longer accepting any

6   donations.  This is all available on the public.

7        THE COURT:  Tell me again, what was -- what was the

8   solicitation?

9        MR. BITTNER:  The solicitation is Direct Action:  Fund

10  Comfrey Root.  There's a little blurb underneath that that

11  explains the situation as to what occurred, the events that led

12  to Mr. Jacobs' arrest.

13       THE COURT:  Does it specifically indicate that it is

14  seeking funds for the legal defense or does it say legal

15  defense and other purposes?

16       MR. BITTNER:  If you can give me a couple seconds,

17  Your Honor, please.

18       Quote:  "The campaign's intent is to raise $5,000 as a

19  seed fund for the path this young man must now walk as he has

20  dared to stand in the way of human aggression toward the other

21  creatures of our planet.  If it raises $25 ,000 or $250,000 or

22  whatever ridiculous amount it takes to fully ensure that this

23  action becomes a symbol of what's possible in creating a world

24  that works for all, that's okay, too."  However, that was later

25  taken down after the $5,000 goal was raised.

1            THE COURT:  Okay.

2            MR. BITTNER:  Thank you.

3            Oh, I apologize, Your Honor.  First paragraph, it

4    specifically states, "If you would like to support Comfrey in

5    his legal battle, you can send him money directly via his Pay

6    Pal address."  Thank you.

7            THE COURT:  Okay.  Anything further you would like to

8    add, Ms. Nelson?

9            MS. NELSON:  Yeah.  Just reiterating, Your Honor, that

10   this wasn't something that Mr. Jacobs initiated.  It was

11   something that an individual undertook on his behalf.

12           THE COURT:  And I -- and I understand that, and I --

13   and I also believe that you did not undertake this activity for

14   financial gain.  I understand that you have beliefs and that is

15   what generated this action, not a desire to make money on it.

16   But I am concerned.  I do -- not interested in having you

17   profit from this and that you shouldn't be rewarded for this

18   behavior.  You should be penalized.

19           Mr. Bittner.

20           MR. BITTNER:  I apologize, Your Honor.  As a response

21   to Ms. Nelson, there is a -- there is a correspondence between

22   Mr. Jacobs and the person who started it in which Mr. Jacobs

23   explicitly states, "Send it to my Pay Pal account or you could

24   write me a check if the Pay Pal account hasn't been set up."

25   Therefore, Mr. Jacobs absolutely acquiesced to this legal

1    defense fund and didn't object to it in any way.  Thank you.

2              THE COURT:  Okay.  The issue before the Court -- Mr.

3    Jacobs, anything further you would like to tell me?

4              THE DEFENDANT:  No.  But I am incredibly grateful for

5    the amount of support that the public has shown me, financially

6    and morally.

7              THE COURT:  The issue that's presented to the Court

8    and what I have to resolve at this point in time is the

9    appropriate sentence for the violation which is interference

10   with a governmental function.  I'm presented with a plea

11   agreement that includes a payment of restitution and some

12   mandatory assessments, a period of one year of probation with a

13   ban from the Park and credit -- or sentence of seven days in

14   jail.

15             Now, what I'm trying to decide is what I do as far

16   as a sentence.  As I indicated earlier, I'm not bound by the

17   plea agreement.  I am free to do what I think is appropriate.

18   I take putting people in jail as a very serious matter, and

19   there are certain things I take into account before I send

20   somebody to jail.

21             I do believe that you do not have any remorse for your

22   actions, but that I also believe is because the actions were

23   generated by strongly held beliefs.  And you did not commit a

24   crime of violence here.  What you did was simple disobedience

25   designed to interfere with a lawful government operation.

1          You exceeded the permissible scope of free speech.

2     While we have a very dear right of free speech in this country,

3     it is not without limitations.  And your actions exceeded the

4     bounds of free speech because you went beyond speech and

5     actively attempted to disrupt a lawful operation.

6          But you also do not have a criminal record.  You have

7     indicated you have a prior arrest, but you do not have a

8     criminal record.  You did not engage in conduct intending to

9     harm anybody physically.

10          I'm having a little bit of a struggle about whether

11     you're somebody I think that I should be putting in jail.

12     Obviously if this is conduct that continued or you -- and I

13     have no indication that you actively attempted to encourage

14     other people to engage in this same kind of conduct.  You may

15     have encouraged people to support the campaigns of the BFC and

16     the beliefs of the BFC, but I don't have any information in

17     front of me that you have encouraged other people to engage in

18     this type of civil disobedience, physically obstructing, so I'm

19     not feeling comfortable with that.

20          And I also think that there are penalties I can impose

21     that will bring home to you the seriousness of your actions far

22     more effectively than that of putting you in -- in the jail

23     being supported, rather expensively, by the United States

24     government for a period of seven days.

25          So, here's what I'm going to do, Mr. Jacobs.  I'm

1    going to impose a fine of $500.  Also, there's a mandatory $10

2    assessment for the victims of crime and a $25 court processing

3    which brings that obligation to $535.

4              I'm going to order you to pay restitution to the

5    National Park Service in the amount of $355.

6              I'm also going to order you to make a community

7    service restitution payment -- I shouldn't say restitution --

8    community service payment to the Yellowstone Park Foundation

9    Wildlife Protection Fund in the amount of $2,500.  This is an

10   organization who does a tremendous amount for the -- for

11   Yellowstone and for the wildlife in Yellowstone, and they

12   can -- they can utilize that assistance, effectively and

13   lawfully, I might add.

14             I'm going to place you on three years of unsupervised

15   probation.  Conditions are that you have no violations of law,

16   federal, state or local.  You will be banned from the entry of

17   Yellowstone National Park for the period of that probation.  I

18   believe that this may be the biggest penalty I give you, quite

19   frankly.  And I hope that this will be a strong indication to

20   anybody who contemplates this same kind of conduct that we

21   cannot and will not sustain this kind of behavior within the

22   park that interferes.

23             Perfectly free to express disagreement and create

24   public awareness about the situation involving the bison,

25   being involved in lawful hearings and discussions about the

1    best way to manage the bison in the Park.  That's all perfectly

2    acceptable.  What you did was not.

3          It is my understanding that because you have these

4    funds available you will be able to pay all of these amounts in

5    the next few weeks.  Is that in fact true, Mr. Jacobs?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  So I will order that all of these monies

8    be paid, and the directions on how to pay them will be set

9    forth in the Judgment by -- I'm going to give you 'till July

10   11th, just so that you can get all the paperwork straightened

11   out.  I don't know how -- the situation involves Pay Pal

12   accounts and all that.  But by July 11th you will pay the fine,

13   the restitution and the community service payment.

14         MR. BITTNER:  Your Honor.

15         THE COURT:  Yes.

16         MR. BITTNER:  I believe the original proposed amount

17   for restitution was 355 and 38 cents.  Did you want to address

18   the 38 cents?

19         THE COURT:  I did not notice the 38 cents.

20         I'm -- I'm going to give you a break.  I'm going to

21   round down to $335.  And I -- is there anything further from

22   the Government?

23         MR. BITTNER:  Just one.  When will Mr. Jacobs have to

24   vacate the Park by?  Thank you.

25         THE COURT:  By 5:00 today.

1          Mr. Jacobs, what I would encourage you to do -- and

2    now, this is the part that is not an order, not part of the

3    sentence -- is that if you have a passion, which apparently you

4    do, for wildlife of this country, that you undertake a more

5    scholarly education on it.  I happen to have a degree in

6    forestry and natural resources from Colorado State University.

7    And I believe that there is always room for scientific and

8    political debate about these issues, and the more knowledge and

9    the more education you have, the more you can contribute to

10   that discussion.

11         And I would encourage you to pursue that to the best

12   of your abilities.  You're obviously intelligent.  You're

13   obviously dedicated.  You have a lot to offer other than tying

14   yourself to a barrel in front of a gate.  I believe that.

15         Okay.  Anything further, Ms. Nelson?

16         MS. NELSON:  No, Your Honor.

17         THE COURT:  You have any other statements, questions

18   for me?

19         THE DEFENDANT:  No, Your Honor.

20         THE COURT:  We will stand in recess.

21      (Proceedings concluded 10:25 a.m., June 20, 2014.)

22

23

24

25

1                        C E R T I F I C A T E

2

3

4

5            I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I transcribed from a digital

9    recording to the best of my abilities the foregoing proceedings

10   contained herein on the aforementioned subject and that the

11   foregoing pages constitute a full, true and correct transcript.

12

13           Dated this 9th day of July, 2014.

14

15

16

17                    /s/ Janet Davis

18           _____

19                          JANET DAVIS
                     United States Court Reporter
20                   Registered Diplomate Reporter
                 Federal Certified Realtime Reporter
21

22

23

24

25